```
MER:HA
F.#2004R00374

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                          04 CR 140 (S-1) (FB)

CONSUELO CARRETO VALENCIA,

         Defendant.

- - - - - - - - - - - - - - - -X
```

GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING
<u>AND BRIEF IN SUPPORT OF RESTITUTION</u>

```
                                        BENTON J. CAMPBELL
                                        United States Attorney
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201


Monica E. Ryan
Assistant U.S. Attorney
     (Of Counsel)

Hilary Axam
Acting Director
Human Trafficking Prosecution Unit
Criminal Section, Civil Rights Division
United States Department of Justice
     (Of Counsel)
```

INTRODUCTION

The government respectfully submits the following memorandum in connection with the sentencing of defendant Consuelo Carreto Valencia ("Carreto"). Sentencing is scheduled for October 30, 2009. For the reasons set forth below, the government respectfully requests that Carreto should be sentenced within the advisory guidelines range as set forth in the plea agreement and that the Court order Carreto to pay restitution to the victims in this case pursuant to the mandatory restitution statute, 18 U.S.C. § 1593.

I. FACTUAL AND PROCEDURAL BACKGROUND

The factual background of the case is set forth in the government's Trial Brief, attached hereto as Appendix A, and in the Presentence Investigation Report ("PSR") dated June 15, 2009.

As the Court is well aware, Carreto was charged on November 16, 2004, in a 27-count superseding indictment charging her, along with co-defendants Josue Flores Carreto, Gerardo Flores Carreto, Daniel Perez Alonso, Eliu Carreto Fernandez and Maria de los Angeles Velasquez Reyes, with: (a) conspiracy to commit sex trafficking, in violation of 18 U.S.C. § 371; (b) sex trafficking, in violation of 18 U.S.C. § 1591; (c) attempted sex trafficking, in violation of 18 U.S.C. § 1594; (d) forced labor, in violation of 18 U.S.C. § 1589; (e) transportation in interstate or foreign commerce for the purpose of engaging in

2

prostitution, in violation of 18 U.S.C. § 2421; (f) conspiracy to import aliens for immoral purposes, in violation of 18 U.S.C. § 371; (g) importation of an alien for immoral purposes, in violation of 8 U.S.C. § 1328; (h) alien smuggling, in violation of 8 U.S.C. § 1324(a)(1)(B)(I); and (I) alien smuggling for financial gain, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii).

Carreto is the mother of co-defendants Josue Flores Carreto and Gerardo Flores Carreto. She is the aunt of co-defendant Eliu Carreto Ferndandez. Carreto, her co-defendants and other uncharged co-conspirators operated an extensive sex-trafficking ring that compelled young Mexican women to perform acts of prostitution. Carreto, as the matriarch of the family, received and collected the largest percentage of the forced prostitution proceeds. Carreto witnessed physical beatings of the victims at the hands of her co-conspirators, harbored the victims in her home, admonished the victims that they were good for nothing but being whores. Carreto also maintained physical custody of the victims' children, pressured the victims to get back to prostituting to earn more money, and took one victim, who was 16 years old at the time, for a late-term abortion at the direction of Carreto and her co-conspirators, telling the victim that the procedure had cost a lot of money and that she would be required to work harder as a result.

In January 2007, Carreto was extradited to the United

States to face the instant indictment, and she entered a not guilty plea to all charges at her initial appearance in the Eastern District of New York on March 3, 2007.

Co-defendants Josue Flores Carreto, Gerardo Flores Carreto and Daniel Perez Alonso each pled guilty to the entire 27-count superseding indictment on April 5, 2005.  On April 27, 2006, Josue Flores Carreto, Gerardo Flores Carreto and Daniel Perez Alonso were sentenced to fifty years, fifty years and twenty-five years imprisonment, respectively.  By Order dated October 8, 2009, the Second Circuit Court of Appeals denied their appeals and affirmed their convictions and sentences.

On July 22, 2009, the day the trial was scheduled to commence and after a jury had been selected, Carreto pled guilty two Count Two of the indictment, pursuant to an agreement with the government, which charged Carreto with the sex trafficking of Jane Doe #1.  Count Two charges:

> In or about and between June 1998 and January 2004, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JOSUE FLORES CARRETO, GERARDO FLORES CARRETO, DANIEL PEREZ ALONSO, ELIU CARRETO FERNANDEZ, CONSUELO CARRETO VALENCIA and MARIA DE LOS ANGELES VELASQUEZ REYES, together with others, did knowingly and intentionally recruit, entice, harbor, transport, provide and obtain by any means a person, to wit, Jane Doe 1, in and affecting interstate and foreign commerce, and did benefit financially and by receiving a thing of value from participation in a venture engaged in such acts, knowing that force, fraud and coercion would be used to cause such person to engage in a commercial sex act.

4

During her allocution, Carreto acknowledged that she harbored Jane Doe #1 in her home in Mexico, knowing that Jane Doe #1 was forced into prostitution at the hands of her sons and co-conspirators in both Mexico and New York, and Carreto acknowledged knowingly receiving the proceeds of, and thereby benefitting financially from, the acts of prostitution that Jane Doe #1 was forced to perform in Queens, New York.

The plea agreement, attached hereto as Appendix B, provides for an order of restitution in an amount to be calculated at the time of sentencing, pursuant to 18 U.S.C. § 1593, which provides for mandatory restitution.

II.   RESPONSE TO CARRETO'S OBJECTIONS TO THE PSR

Carreto's guilty plea was entered pursuant to a plea agreement wherein the government estimated an adjusted offense level of 33 and a corresponding advisory guidelines range of 135 to 168 months.  The Probation Department estimates the same range.  PSR ¶ 73.

In her October 14, 2009 sentencing memorandum, Carreto, while not contesting any of the factual findings set forth in the PSR, objects to the advisory guidelines range set forth by the Probation Department in the PSR.  Specifically, Carreto argues that she should not receive a 3-level enhancement for her role as a manager in the criminal organization.  Carreto acknowledges that the guidelines calculation is otherwise correct.  See Def.

Mem. at 4.

    A.    <u>Carreto Was a Manager in her Family's Sex Trafficking Ring</u>

The uncontested facts of the PSR provide ample evidence establishing Carreto's role as a manager in the Carreto family sex trafficking ring and warranting imposition of the 3-level role enhancement. All of the victims understood Carreto to be the matriarch of the family, and an important member of the organization. PSR ¶ 43.

The uncontested facts of the PSR demonstrate that Carreto directly supervised at least two members of the conspiracy, Eliu Carreto Fernandez and Eloy Carreto Reyes. This alone qualifies her for the role adjustment, as a defendant need only to have supervised "one or more other participants," not all other participants. <u>See</u> U.S.S.G. § 3B1.1, application note 2.

Further, on page 5 of her brief Carreto admits that she exercised control over the victims, and, it is clear she "exercised management responsibility over the property, assets, or activities of [the] criminal organization," U.S.S.G. § 3B1.1 application note 2, by harboring and controlling the victims, maintaining physical custody of their children, facilitating the recruitment of more victims, and collecting and safeguarding the criminal proceeds. <u>See</u> PSR ¶¶ 15-18, 20-22, 29, 30, 33, 36, 39-41, 43-44. This type of management responsibility, as defined by application note 2, is sufficient to apply the 3-level role

enhancement even if Carreto did not supervise another participant. Here, where Carreto supervised at least two others, Eliu Carreto Fernandez and Eloy Carreto Reyes, the management of the property, assets, and activities of the criminal organization, coupled with the management of other co-conspirators provides two separate, independent grounds for the role enhancement.

Carreto's integral role in managing the affairs of the conspiracy is evident from multiple facts set forth in the PSR. Carreto continuously told the victims that they needed to work more and earn more money. PSR ¶ 43. The victims knew that they must obey what Carreto told them, because if she complained to her sons, they would be beaten. Id. Carreto also employed co-conspirator Eliu Carreto Fernandez to drive the victims to various brothels and to pick up money from wire remitters. Id. Carreto likewise employed Eloy Carreto Reyes for similar tasks for approximately four years. PSR ¶ 44. This supervision of two co-conspirators in carrying out the operation of the conspiracy clearly demonstrates Carreto's managerial role.

Further confirming Carreto's managerial status in the organization was her role in collecting the greatest share of the proceeds of the sex trafficking conspiracy. PSR ¶ 39. Wire transfer documents obtained by the government indicate that Carreto personally received at least $219,660 in prostitution

proceeds during the life of the conspiracy. PSR ¶ 41. All of this conduct is highly significant and supports application of the role enhancement. See U.S.S.G. § 3B1.1, application note 4 (noting "right to a larger share of the fruits of the crime" as a relevant factor).

    B. Section 3553(a) Factors Weigh In Favor of a Sentence Within the Applicable Guidelines Range

There is no dispute that the crime of conviction, sex trafficking of a young woman, is a serious offense warranting serious punishment. Also important are the considerations of both general and specific deterrence. Carreto lived well for decades, financially benefitting from the prostitution proceeds the many victims in this case were forced to earn at the hands of Carreto and her co-conspirators. The government therefore respectfully submits that the defendant should be sentenced within the applicable guidelines range as set forth in the plea agreement and the PSR.

III. RESTITUTION

    A. Applicable Law

Title 18, United States Code, Section 1593(a) imposes a requirement of mandatory restitution for any Chapter 77 offense, including the count of conviction in this case, sex trafficking by force, fraud or coercion in violation of 18 U.S.C. § 1591.

Section 1593(a) provides that the court "shall order restitution for any offense under this chapter." 18 U.S.C. §

1593(a) (emphasis added). The restitution order "<u>shall</u> direct Carreto to pay the victim . . . the full amount of the victim's losses," and those losses are defined to include:

> the <u>greater</u> of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act (29 U.S.C. § 201 <u>et seq</u>.).

§ 1593(b)(1),(3) (emphasis added).

In this case, the victims' losses are substantial by either measure.

> B.  Carreto Is Liable For Losses Resulting From the Conspiracy

Because Carreto's guilty plea to Count Two is predicated on her having carried out the crime of conviction in concert with, and as an integral part of, the conspiracy with the co-defendants charged in Count Two, Carreto is liable for the losses resulting from the conspiracy. Where, as here, the factual basis of the conviction implicates the defendant in the conspiracy conduct, and necessarily subsumes a finding that the defendant acted as part of the charged conspiracy, the defendant is liable for the losses incurred at the hands of the conspiracy. <u>See</u> <u>United States v. Boyd</u>, 222 F.3d 47, 48 (2d Cir. 2000). Here, as in <u>Boyd</u>, because the conduct underlying the count of conviction was carried out both by Carreto and by her co-conspirators, including Carreto's sons, it is appropriate here,

9

as it was in <u>Boyd</u>, to "order a participant in a conspiracy to pay restitution even on uncharged or acquitted counts." <u>Id</u>. at 51.

Thus, Carreto is liable for restitution to each identified victim of the conspiracy that compelled and coerced the victims into prostitution for the profit of Carreto and her co-conspirators. In <u>Boyd</u>, the defendant contended that the court was authorized to award restitution "based only on the conduct of the defendant, and not on the conduct of others." <u>Id</u>. at 50. The <u>Boyd</u> court disagreed, emphasizing that, under the discretionary restitution statute applicable in that case, Congress had "broadened the scope of restitution from losses attributable solely to the offense of conviction to all losses caused <u>in the course of a defendant's criminal conduct, whether the defendant is convicted of each of those offenses or not</u>." <u>Id</u>. (emphasis added) (citations and internal quotations omitted); <u>see also</u> <u>United States v. Chaney</u>, 964 F.2d 437, 451 (5th Cir. 1992) (rejecting defendant's claim that restitution could not be awarded "for losses that may be attributed to conduct that is the basis of charges for which the defendant is acquitted).

Thus, the <u>Boyd</u> court concluded, there was proper authority "to order a participant in a conspiracy to pay restitution even on uncharged or acquitted counts," so that where the count of conviction necessarily subsumed the finding that the defendant was a member of the conspiracy, committed her offense

pursuant to the common plan of the conspiracy, and could reasonably have foreseen the offenses of co-conspirators, <u>Pinkerton</u> liability supports imposition of a restitution order for all "reasonably foreseeable acts of all co-conspirators, even if the defendant was not convicted of a conspiracy count. <u>Id</u>. at 51. While engagement in a concerted scheme must be integral to the conduct underlying the count of conviction, see <u>United States v. Donaghy</u>, 570 F. Supp. 2d 411, 427 (E.D.N.Y. 2008)(noting that restitution is permissible for "uncharged or acquitted conduct that is part fo the scheme, conspiracy, or pattern of criminal conduct that was an element of the offense of conviction," but "does not allow for recovery for what are acts in furtherance of a broader uncharged scheme being carried out alone by one of the co-conspirators"), in the instant case, the factual basis underlying Carreto's conviction on Count Two is replete with facts establishing that she carried out the offense as part of the common plan of the conspiracy. According to Carreto's allocution, Carreto's son and co-conspirator Josue Flores Carreto brought Jane Doe #1 to Carreto's home where Carreto harbored her. Carreto further admitted that Jane Doe #1 was forced into prostitution in both Mexico and New York by Carreto's sons. Finally, Carreto admitted receiving prostitution proceeds sent from New York to her in Mexico. Clearly, members of this sex trafficking ring each played distinct roles in carrying out the

forced prostitution scheme, and because acts integral to commission of the offense charged in Count Two were carried out by Carreto's co-conspirators, a finding of participation in the conspiracy conduct is subsumed within Carreto's conviction on Count Two. Thus, just like the defendant in <u>Boyd</u>, Carreto is liable for restitution for the losses "suffered by all victims of [the] conspiracy, regardless of the facts underlying [the] count[] of conviction." <u>Id</u>. at 50. Carreto is therefore liable for the losses attributable to the sex trafficking scheme underlying the offense charged in the count of conviction to which Carreto pled guilty.

<u>     C.    Restitution Calculation</u>

By engaging in a scheme to compel the victims into prostitution against their will, Carreto and her co-conspirators generated significant ill-gotten profits for themselves, and inflicted substantial losses on the victims, who were deprived of their freedom and their opportunity to pursue a gainful livelihood for the benefit and subsistence of themselves and their families.

While no monetary amount can make the victims whole for the emotional and psychological trauma described in the Victim Impact Statements recounted in the PSR, at a minimum, Carreto should be required to disgorge to the victims of this scheme a fair measure of the profits Carreto and her co-conspirators

extracted from the exploitation of the victims.

As described in the PSR, the victims were required to perform commercial sex acts in Queens, New York, and elsewhere, for the profit of Carreto and her co-conspirators. Each commercial sex act generated $25-$35 in profits, half of which was retained by the brothel owner and half of which the victims were ordered to turn over to Carreto and other members of Carreto's family. PSR ¶ 9. At times, proceeds of the sex trafficking operation were wired to Carreto and her associates in Mexico at a rate of $800 to $1,600 per week. PSR ¶ 11.

1. <u>Jane Doe #1</u>

Specifically, Jane Doe #1, the victim identified in Count 2 of the superseding indictment, was victimized and exploited for coerced prostitution from June 1998 through January 2004. She was forced to engage in prostitution in the United States and to send proceeds from Queens, New York to Carreto and Carreto's associates from the Spring of 2003 through January 2004. PSR ¶ 16. During this time, she was forced to engage in prostitution from the morning until late into the night, frequently servicing more than twenty customers per day. <u>Id</u>. Calculating conservatively, to include only the acts of prostitution performed within the United States, excluding the compelled acts of prostitution carried out in Mexico pursuant to the same criminal scheme in Mexico from 1998 through 2003;

calculated conservatively to include only ten acts of prostitution per day rather than the twenty described in uncontested paragraphs of the PSR; and calculated conservatively to assume that Carreto reaped only $10 per compelled sex act rather than half of $25-$35; and calculated conservatively to assume the victim was compelled into prostitution only five days a week, rather than six or seven days a week, Carreto profited $100 per day, or $500 per week.  See PSR ¶¶ 13-16.  Again calculating conservatively to include only the 30 weeks beginning June 2, 2003 through December 29 2003, in lieu of the arguably longer period between spring 2003 and January 2004, the resulting calculation is as follows:

**$500 per week x $30 weeks = $15,000.**

    2.   <u>Jane Does #2-5</u>

The uncontested facts of the PSR indicate that Carreto profited from the sex trafficking of multiple victims of the sex trafficking ring, and the PSR provides sufficient detail to calculate with reasonable accuracy the amount of ill-gotten profit attributable to the victimization of the victims identified in Counts One and Three through Seven of the superseding indictment, who are identified in those Counts as Jane Does 2 through 5, respectively.  As recounted in the PSR, these victims were abused and exploited under similar circumstances and during similar time frames, resulting in

14

calculations of criminal proceeds comparable to the conservative calculations set forth above with respect to Jane Doe #1.

Applying the same conservative assumptions outlined above, Carreto reaped an additional $15,000 in criminal proceeds from the exploitation of each of the additional Jane Does 2, 3, 4, and 5. Thus, calculated conservatively as per the analysis above with respect to Jane Doe 1, the total losses resulting from the scheme underlying Carreto's count of conviction are as follows:

Jane Doe 1: **$500 per week x $30 weeks = $15,000**

Jane Doe 2: **$500 per week x $30 weeks = $15,000**

Jane Doe 3: **$500 per week x $30 weeks = $15,000**

Jane Doe 4: **$500 per week x $30 weeks = $15,000**

Jane Doe 5: **$500 per week x $30 weeks = $15,000**

Total: **$75,000**

Based on uncontested facts in the PSR, Carreto and her associates profited to a far greater extent than reflected in the calculations above, including exploitation of each of these identified victims for extended periods of forced prostitution in Mexico, forced acts of prostitution in far greater numbers per day than the estimates used in these calculations, forced prostitution for substantially more than five days per week, and

forced prostitution of additional victims.

As noted in the PSR, Carreto received and collected the largest percentage of the money from the instant offense. Carreto personally witnessed physical force used to control the victims and compel them into prostitution. She also maintained physical custody of the victims' children and would pressure them to send more money to support their children. PSR ¶ 39. Furthermore, as detailed in the PSR, Carreto received the proceeds of the sex trafficking ring and the evidence indicates that she and appointed associates acting on her behalf received at least $291,660 via wire remitters. PSR ¶ 41.

By profiting from the brutal exploitation of all the victims ensnared in the Carreto family sex trafficking scheme, Defendant Consuelo Carreto Valencia, the matriarch of the Carreto family, was able to reside in a luxurious home while the victims retained next to nothing from years of compelled prostitution. PSR ¶ 43.

The Carreto family sex trafficking ring, in which Carreto played an integral role, inflicted suffering on its victims, as detailed in the Victim Impact Statements contained within the PSR at pages 14-23, in a manner and to an extent that cannot be compensated by any monetary amount. However, recognizing that defendants should not be permitted to profit from such crimes, but rather should be required to disgorge their

ill-gotten criminal proceeds to the victims of their criminal schemes, Congress enacted a mandatory restitution statute codified at 18 U.S.C. § 1593, which provides for restitution in the full amount of the victim's losses, which may be calculated according to the gross income to Carreto. The government respectfully requests that the Court consider the calculations above in determining an appropriate restitution amount pursuant to 18 U.S.C. § 1593 and the plea agreement.

While most of the criminal proceeds generated by the Carreto family sex trafficking ring were spent or sent to Mexico before the government had the opportunity to seize them, $29,950 in U.S. currency was seized on July 29, 2004 by ICE agents from the home of Edith Mosquera, a co-conspirator of the sex trafficking ring who operated a brothel on Coney Island Avenue in Brooklyn, New York.[1] Jane Does #1-5 all engaged in prostitution activity at this brothel. The government respectfully requests that the Court order restitution according to the calculations set forth above, and further respectfully requests that the seized assets of $29,950 be applied toward satisfaction of the restitution order.

---

[1] Mosquera was charged separately in case number 04-CR-997 (FB), pled guilty and was subsequently deported. Neither Mosquera nor any other co-conspirator made any claim to the seized money.

17

IV.   CONCLUSION

The government respectfully submits that defendant Consuelo Carreto Valencia should be sentenced in accordance within the advisory guidelines range of 135 to 168 months, and that restitution should be ordered based on the calculations set forth above, in accordance with the terms of the plea agreement and the mandatory restitution provision of 18 U.S.C. § 1593.